Hartshorne v Thomas.

---

## JOSEPH C. HARTSHORNE

### *v.*

## GEORGE W. THOMAS.

In 1780, the British frigate "Hussar," with nearly $5,000,000 in gold, sunk in the East river, opposite New York, in about seventy feet of water. Several unsuccessful efforts were made to recover the treasure. In 1880 the defendant procured a license from the treasurer of the United States to recover it for his own use. He afterwards obtained from complainant and others, who were familiar with the enterprise and its object, considerable sums of money, giving therefor a written stipulation to restore to the lenders, from the treasure when recovered, $37,500 for each $5,000 thus advanced. He prosecuted the search diligently for several years, but never recovered any of the gold, and all his apparatus was eventually sold under a chattel mortgage thereon, held by the complainant for some of his advances.—*Held,* that complainant was entitled to an account of the moneys thus advanced, their application &c., and of the moneys, if any, put in by the defendant or others, in which account defendant was to be allowed a specified weekly amount for his services during the exploration.

On bill, answer, and proofs.

Mr. *Samuel C. Mount,* for complainant.

Mr. *Charles T. Glen,* for defendant.

BIRD, V. C.

The British frigate "Hussar," sunk near the city of New York on the 25th of November, 1780, was a thirty-two gun ship, two hundred and six feet in length, fifty-two feet two inches beam; one of England's proudest ships. She had on board £580,000 in treasure, for the purpose of paying the army and navy, they having been without pay for nearly three years. The "Mercury" also sailed for the same destination with £380-000 of British treasure on board. Its destination was, also, New York. The "Hussar" lay at anchor off the Battery two days after her arrival, and during this time the treasure on board the "Mercury" was transferred to the "Hussar," the city then being besieged by an army of American rebels, and in great danger of capture. The "Hussar" was then ordered to sail forthwith to Newport, Rhode Island, and on her way up the East river to the sound struck upon Pot rock, nearly opposite the upper extremity of Randall's Island. An effort was made to land her at Port Morris. When she got within less than one hundred yards of the shore she sunk immediately, with all on board, numbering about one hundred and fifty, leaving only the topmasts in view. There were many American prisoners on board, and, being chained below, went down with the ship, the loss of whose lives created a deep feeling of indignation among revolutionary patriots throughout the country. The shore where the vessel went down, and where she now lies, has nearly perpendicular walls, and at medium tide the water is about seventy feet deep. The whole amount of money on board is estimated at $4,800,000.

In 1794 the British government employed two brigs and labored two summers endeavoring to raise the ship by means of grapples, but without success. It is said that they were ordered

off by the American government.   In 1819 the work was again undertaken by a British company, endeavoring to operate upon the ship by means of a diving bell, the most effective submarine appliance known at that time, but, owing to the great volume of tide, it was compelled to abandon the enterprise.   After this the British government offered a large salvage to induce parties in the states to undertake the raising of the ship, and two or three companies were organized for that purpose in and about Philadelphia and Baltimore, and made the attempt, but without success, owing to the great strength of the tide at all times.

In 1848 Captain Taylor invented what was called "submarine armor," and he was so confident that his invention could successfully operate upon the "Hussar" that he was induced to obtain personal knowledge at the admiralty department in England in regard to the amount of treasure.   He labored in the undertaking until his death.   He willed his invention to his friend, Charles B. Pratt, of Worcester, Mass., with his entire outfit which he had been three years or more collecting, upon condition that Mr. Pratt should prosecute the work until the treasure was finally obtained, and that he should give one-sixth thereof to his wife and daughter.   Mr. Pratt accepted the terms and was joined in the enterprise by others, and very much was accomplished.

The ship's decks were entirely removed, twenty-six cannon (large and small) were taken up and sold for $1,500, some four thousand cannon balls, large quantities of rotten cordage, many bushels of gun flints, several leather buckets with the name of "Hussar" on them, and which may be seen at the Historical Rooms in the city of Worcester, many human bones and skulls, manacles and chains, glass, earthen and pewter wares, the ship's bell, and hundreds of articles usually on board a war vessel, most of which are still in the custody of the company, were recovered.

Thus Mr. Pratt and his friends continued the work, with commendable energy, until 1866, when individual interests had been divided, subdivided and resubdivided, and the fractions scattered far and near.   But with a great deal of trouble and in-

Hartshorne *v.* Thomas.

quiry the several interests were collected and a company incorporated under the laws of New York, with a nominal capital corresponding with the amount of treasure the "Hussar" was supposed to contain, and divided into forty-eight thousand shares of $100 each, and known as the "Frigate Hussar Company." This company has worked with more or less success since that time, and it would seem that a little more effort and money would have accomplished the desired object.

Another effort was made to get the submarine company which operated upon the steamer "Golden Gate," lost on the Pacific coast with one million of gold on board, to operate upon the frigate "Hussar;" but it does not appear that that effort was successful. It is in evidence that from 1857 to 1880 there were continuous efforts made by different interests to reach and raise the frigate "Hussar," or to lift her buried treasure from her hulk. Although he had commenced searching for the prize in 1879, in 1880 George W. Thomas, the defendant, being influenced by a strong desire to exhume this treasure, and by a strong conviction that it could be accomplished, secured permission from the government to proceed, solicited aid from his friends for the purpose of beginning and carrying on the enterprise. Money was advanced to him by them. On the receipt of money he acknowledged it, and gave them a stipulation, of which the following is a copy:

"*Whereas*, I, George W. Thomas, of the borough of Hackettstown, county of Warren and State of New Jersey, now hold a contract made to me by the Secretary of the Treasury, on behalf of the Government of the United States of America, by which contract I am placed, and now am in possession of the remains of the sunken hull of the British frigate Hussar, with all the treasure, whether in silver or gold, now or heretofore connected with said sunken hull, and now lying in the East river, or Long Island sound, near Port Morris, and State of New York; and

"*Whereas*, I have received from     the sum of dollars, the receipt whereof I hereby acknowledge:

"I hereby agree that I will as soon as I recover the said treasure, pay to the said     the sum of     dollars, with no delay more than will be necessary to convert the same into lawful money of the United States.

"In witness whereof, I have hereunto set my name this    day of A. D. 1883."

The complainant advanced to the defendant, Thomas, $5,000, in the first instance, which was acknowledged by the signing of such a receipt.   This was upon the 16th day of February, 1882. On the 2d day of March, 1883, he advanced to him $5,000 more, on like terms.   On the 13th day of· May, 1883, he advanced to him $3,000 additional, which last sum the complainant insists was upon the same representation and for a like purpose, but which the defendant insists was loaned to him upon his own personal security, together with a chattel mortgage on the scow in use at the work, and without reference to the enterprise of raising the buried treasure.

The enterprise thus begun by Thomas was carried on until January, 1884, when his supporters became discouraged, sought to call him to account, and, failing in that, according to their wishes, they formed a company for the purpose of carrying on the work themselves.   They succeeded in having the government annul all obligations between· it and Thomas.   The property which Thomas had was attached, and when the attachment proceedings were settled and disposed of, the chattel mortgage given to the complainant by Thomas was enforced, and all the principal appliances which he had for the purpose of carrying on the work were sold thereunder.   And thus this enterprise also proved an absolute failure.

While Thomas was thus engaged in the work, he purchased real estate at Hackettstown and personal property.

No part of the money advanced by Hartshorne has ever been repaid, except what was realized from the sale, under the chattel mortgage, of the scow and appliances used in searching for the treasure.

The bill in this case is filed, asking that the contract so made by Thomas with Hartshorne and others be specifically performed ; that a receiver may be appointed to take charge of the property so purchased by said Thomas ; that said Thomas account for all the moneys received by him, and also for all the property purchased by him by and with the money so furnished to him to be used in raising and recovering the said treasure.

A supplemental bill charges that, since the filing of the original bill, the government of the United States had declared the contract with Thomas null and void, and had withdrawn from him all privileges and authority to prosecute said work. In the supplemental bill the prayer for specific performance is omitted. The prayer for the receiver is repeated, and the prayer that · Thomas be required to render an account of the moneys received and expended by him, and also of the property purchased by him by and with the money so furnished to him to be used in raising and recovering the said sunken treasure, and that he be enjoined from encumbering, committing waste upon, or conveying the property so purchased.

This money was borrowed from Hartshorne and others, from time to time, during the years 1880, 1881, 1882 and 1883. All of the facts connected with the sunken treasure, and all of the facts which had transpired within the knowledge of Thomas, and the action of Thomas himself, were known to Hartshorne. In no particular can I find that Thomas deceived any one with respect to the character of the undertaking, or the history connected with the frigate. Indeed, I cannot see how any sane man could have been deceived. And it may be observed that if any information was wanting, it was equally accessible to Hartshorne as to Thomas. It is just to say that I can discover nothing which tends to the conclusion that Thomas attempted, in any sense, to mislead. That the accomplishment of the undertaking was certain, in his mind, is very plain. He undoubtedly believed that he would be successful, and he made every reasonable effort to convey this conviction to the minds of those from whom he sought pecuniary aid. It would not, perhaps, be departing from the truth to say that his expressions were over-confident, and that cautious men, men not given to speculation, or fond of pursuing chimeras, would not have entertained his propositions. Most probably such men would have spurned the proposition made by Thomas, and would have found his convictions utterly baseless in the immense reward that was offered for the loan—that is, $37,500 for the advance of only $5,000. But it is not the first time that a shining hook has been grasped to be followed by

mortification and loss.    After these observations the inquiry comes:  What were the true relations of these parties?   Was it a partnership?   I am not prepared to say that there was a partnership created, although it was agreed between them that there should be a participation in the profits.   The profits were not uniform.   They also shared in the loss by losing all that each put in, while Thomas was under no obligation to lose anything but his time.   He may have put in money, but he was not obliged to do so.   Thomas borrowed this money, in one sense, yet the relation between him and Hartshorne was more than that of borrower and lender.   He did not agree to return the money so borrowed.   In my judgment, the relation of principal and agent more nearly characterizes the relations of one to the other, and, so far as the doctrine of trusts is applicable to agents, it may be extended to the case under consideration.  It seems to me that the facts stated show the equivalent of this—that is, that Thomas agreed with Hartshorne to use Hartshorne's money in the enterprise, and to give him in return therefor $37,500 for each $5,000 advanced by Hartshorne, in case the whole amount of the treasure was recovered, and a like proportion for the additional advance of $3,000.   Thus, it appears by the agreement signed by Thomas, that he accepted this $5,000, and promised, in case of the success of his undertaking, to return therefor the $37,500.   Here was a promise dependent upon the result of an undertaking—of a hazardous enterprise—one known so to be, in the language of some of the witnesses, "a mere speculation."   But, whatever it may have been, however chimerical, the speculation, if not contrary to public policy, it ought to be considered as binding.   It was not a gift to Thomas of $13,000.   It was advanced upon a promise from him that he would prosecute the work and divide the treasure, if he should recover it.   This is a contract.   And certain it is that this contract shows a legal liability.

If this be true, it follows that the defendant should be required to account.   He accepted these funds for a lawful purpose, and when called upon must respond for the use of them.   To this extent there can be no doubt.   But what shall be required of the defendant in accounting?   How far shall he

be charged? The complainant urges that he is liable for negligence in the management of the work, and for the unnecessary expenditure of money in its prosecution. Of course it would be exceedingly difficult in a court of equity to induce the court to believe that it would be justified in charging an agent in such case—in such a speculative enterprise, so full of uncertainty—with ordinary negligence; in other words, to award damages to the complainant for the non-fulfillment of the obligations of an agent when the principal knew, or ought to have known, of the defendant's connection with the enterprise, and of all the hazards and risks involved in the work. As I have already intimated, the complainant knew, or ought to have known, not only of the hazardousness of the undertaking, but of the physical difficulties which were, beyond any dispute, in the way. It will not do for the complainant to say that he had no knowledge of the repeated efforts made theretofore to raise this frigate and the sunken treasure it contained; nor will it do for him to say that he was ignorant of the fact that every one of those efforts had signally failed. To go no further back than 1857, it is perfectly well understood that from that period the efforts to raise the " Hussar " had been continuous until the time Mr. Thomas took hold of it. Not more than one or two years, at the furthest, elapsed when there was not some one pressing onward for the prize. The difficulties connected with the work, and the manner in which it was prosecuted, are all fully stated in the testimony of the witnesses. There seems to be no material discrepancy or dispute on these important branches. Thomas, as has been stated, commenced first in 1879, but not under the sanction of the government until 1880. He had a scow of over two hundred tons burden, one hundred feet in length, about twenty-four feet in width, amply able to carry on the work, and as large as the majority of vessels used in such submarine work. She had a sand pump with a six-inch opening, with a four-inch driving apparatus, all complete. And he had, also, air pumps and all necessary apparatuses for diving; in a word, she was fully equipped, and the great preponderance of the testimony is that she was kept in effective working order. Undoubtedly the work was very slow;

the weather and the tides were often contrary and controlling. Before reaching the ground there was about eighty feet of water over the place where the wreck was supposed to be; then three or four feet of thick mud; then a hard material, which varied in thickness from twenty to fifty feet in different places; after this a rock-like substance was struck in different places and drilled. Before Thomas undertook the work it was prosecuted by divers, who would gather and bring up, on an average, about twelve bushels of stuff per day. Thomas's plan was to pump out this material, which had before been brought up in bags. He sent down a six-inch tube to the bottom, and then set his pumps to work and pumped up the material on to the deck of the scow, upon a screen, which separated the coarser material from the sand and mud. The water, sand and mud passed off from the screen into the river, while the coarser portion remained on the vessel to be sorted over. The divers were sent down every day to examine the bottom, shifting the pipes, and when they struck this hard material they were forced to use force pumps to break it up. These force pumps operated by a stream of water directed against this hard material, and it was necessary for the diver to direct the nozzle. Thomas's equipments and methods were perhaps better than any that had been previously adopted. Under his management the work progressed faster than it had before. He carried it on continuously, except when prevented by bad weather. One witness, an experienced and expert diver, says that in all his work as a diver and wrecker he never engaged in any work so difficult as this. And after all this effort and expenditure, Thomas recovered not a dollar.

These statements, though very brief, I think amply characterize the nature of the work, the difficulties of the undertaking and the physical obstacles in the way, and the uncertainties of anything like success by any one. But these difficulties are brought out still more distinctly to the mind by the fruitless effort of the Treasure-Trove Association, the new company which was formed by the complainant and others at the time, or soon after they succeeded in obtaining control, by sale under the chattel mortgage or otherwise, of the property and appliances which

Thomas had been using. It is in evidence, and not contradicted, that they not only used electrical appliances, but spiritual as well, having a female medium on board for the purpose of locating the treasure. But as yet no sort of divination, however much seconded by electricity, or *vice versa*, has rescued this coin from its long resting place.

But the doctrine of agency having been established, and it having been ascertained that Thomas was guilty of no fraud in obtaining the funds committed to his care, and that he exercised reasonable diligence in the conduct of the work which he had engaged to do, what remained ? Nothing, it seems to me, but for Thomas to account. This, I think, he is under obligation to do. It is true this was resisted upon the ground that the complainant had forfeited all claims to an account by his ruthless interference with the conduct of the work, and without any propriety, by absolutely depriving the defendant of all means to carry it on. But this was not done until after Thomas had refused to account. It is insisted that, the work being so difficult, it was not to be expected that the end could be obtained in any short period of time, and that, with the observation and experience which Thomas had had, he was better prepared to prosecute it than any person unacquainted therewith possibly could be, and that it was wholly unjustifiable in the complainant and his associates, by the device which they adopted under the attachment, and by the sale under the chattel mortgage, to wholly destroy his ability to proceed, and that having done so, with full knowledge of the situation, they have forfeited all claims whatsoever upon him for an accounting. Though there be great force in this, and the mind be very much influenced thereby, yet the doctrine of agency having been established, the principles applicable to such cases must control. The principal had a right to terminate the agency. The agent must account for the principal's money, and for the use or expenditure thereof. There seems to be no reason, therefore, under the law, why the defendant should not account for all the moneys which he has received and for the application of them. Especially is there force in this when the fact that he refused to account, when called upon to do so, is considered.

The principal was entitled to know to what uses his money had been put. Thomas had not only not accounted for the use of any of these moneys, but had destroyed some of the imperfect accounts he had once kept. An account will therefore be ordered.

In my judgment, the complainant is entitled to be credited with the whole $13,000, but should be charged with what he realized from the sale under the chattel mortgage.

In ascertaining the extent of the complainant's interest, it will be necessary to take an account of all the money that was expended, if any, by Thomas in the work, and thus ascertain and establish the proportion of the whole which was contributed thereto by the complainant. From this it will be learned whether Thomas himself contributed thereto or not, and also whether all which was contributed was expended on the work, and likewise the proportion of what remains unexpended, if any, that the complainant is entitled to. In the accounting, I mean that all the items which Thomas calls "special loans" shall be included. He says that the $64,203.05 includes the "special loans," thus showing that they were employed in the work. Besides he gave the lenders to understand that they were to be so employed.

This account should state a balance, or should rest at the time Thomas commenced work under the contract with the government. In making a statement of the remaining period, everything which appears in the evidence pertaining to the work in question is to be considered. The defendant is entitled to credit, as intimated, for all that he put in of his own money.

The defendant should be allowed $25 a week during the working season (not during the winter, when work was suspended) for his time and services. So far as the evidence goes on this point, the preponderance is that this is what he claimed it would be worth, and by this offered inducements to his friends to make loans. He is not entitled to any credit for expenses, counsel fees, or other charges for litigation, from and after his refusal to account at the Victoria Hotel.

It will be referred to a master accordingly, and the injunction heretofore granted should continue.